```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| UNITED STATES OF AMERICA              ) | |
|                                       ) | CRIMINAL NO. 04-10363-DPW |
|     v.                                    ) | |
|                                       ) | |
| WILLIAM STANLEY, ET AL.,              ) | |
|       Defendants                      ) | |
|                                       ) | |

**Government's Motion In Limine To Admit The
Testimony Of Government Witness Richard Adams**

### Introduction

The United States of America, by Michael J. Sullivan, United States Attorney, and Michael J. Pelgro, Assistant U.S. Attorney, hereby files this motion in limine to admit the testimony of government witness Richard Adams. As set forth more fully below, the government submits that such testimony, in its entirety, is admissible under Fed. R. Evid. 404(b) and 403 in order to provide the jury with information concerning the origin and operation of the charged conspiracy as well as to prove that defendants Anthony Saunders, Sandra Saunders, and Kevin McIver acted with the requisite knowledge and intent.

### Factual Background

Richard Adams ("Adams") is a charged defendant in this case. On November 8, 2004, he was observed off-loading approximately 1500 pounds of marijuana from a tractor-trailer into a warehouse in Billerica that was owned by defendant Kevin McIver

("McIver").[1]  After off-loading the marijuana, Adams assisted defendant William Stanley ("Stanley") in breaking up the marijuana and re-packaging it for distribution.

On that date, Manning drove a pick-up truck registered to defendant Frederick Pidge ("Pidge") to the Billerica warehouse. After approximately 500 pounds of marijuana was loaded into large toolboxes, which were then placed onto back of the pick-up truck, Manning drove it from the warehouse to Pidge's house in Billerica, where Pidge and defendant Anthony Saunders ("Saunders") were waiting.[2]  Federal and state law enforcement agents recovered the marijuana from the pick-up truck in Pidge's driveway and performed a consent search of Pidge's residence, leading to the recovery of a smaller quantity of marijuana and other non-drug incriminating evidence.

On that date, defendants Sandra Saunders ("Sandra") and Leon

---

[1] Various agents, including the undercover agents, observed that McIver and defendant John Manning ("Manning") dropped off a forklift at the warehouse.  The forklift was used to off-load the marijuana.

[2] Earlier that day, a person fitting the description of Sanders drove a car registered to Saunders to a pre-arranged location in Somerville in order to meet up with the tractor-trailer, which had been driven from Laredo, Texas by two undercover agents.  Defendant Felix Parra Gastelom ("Parra") was sitting in the back seat of Saunders's vehicle and, at one point, gave a "thumbs up" hand signal to the undercover agents. Defendant William Stanley ("Stanley") got out of Saunders's vehicle, gave a large sum of cash to the undercover agents in payment for their services, and accompanied them to the Billerica warehouse.

Romprey ("Romprey") drove a van to the Billerica warehouse. After Stanley and Romprey loaded approximately 500 pounds of marijuana into the van, Sandra and Romprey drove away. The van was subsequently stopped on the road and the marijuana was recovered.

Adams has pleaded guilty pursuant to a written plea agreement with the government. Adams has been debriefed on multiple occasions and narrative reports summarizing those debriefings have been disclosed to counsel for all defendants. Adams will testify to the events of November 8, 2004 from his perspective.

### Anticipated Testimony of Adams

It is anticipated that Adams will testify that he met, and became friendly with, Pidge while both were serving a sentence of incarceration at a state prison in Massachusetts. Adams will testify that he was released from prison in or about April 2002 and that he was living in Revere. At some point thereafter, Adams invested $10,000 to purchase a small cellular telephone business in Chelsea. Adams obtained this money from Pidge. Adams lost money as a result of owning this store. Pidge thereafter offered Adams the opportunity to work off his debt, and to make money, by becoming involved in the marijuana conspiracy. Pidge introduced Adams to Saunders, whom Adams understood to be in charge of the operation.

3

From late 2002 to November 8, 2004, Adams participated in the conspiracy as an off-loader of the tractor-trailer trucks that came into the Billerica warehouse.  Adams will testify that he was involved in off-loading and re-packaging six separate loads of marijuana that came into the warehouse in a manner identical or substantially similar to what happened on November 8, 2004.  Through Pidge, Adams met Stanley and Manning, who were also involved in off-loading and re-packaging the loads of marijuana.  Adams also met McIver, who was present at the warehouse when certain loads came in.  Adams will testify that Pidge told him that McIver was paid $25,000 per load for allowing the defendants to use his warehouse as a staging area.

Adams will testify that, in connection with a particular load earlier in 2004, Manning was unavailable so McIver stepped in and assisted Adams and Stanley in off-loading and re-packaging the marijuana.  On this occasion, McIver used both a saw and an acetylene torch, to open the metal containers containing the marijuana.  The empty containers from this load were left in a particular section of the warehouse that subsequently suffered some flooding due to heavy rains.  These water-logged containers were found by law enforcement when they entered the warehouse on November 8, 2004 pursuant to a federal search warrant.

Adams will testify that, in connection with one of the loads, Saunders and Pidge came to the warehouse and brought a

case of water for the off-loading crew.

Adams will testify that some of the marijuana was often re-packaged into large toolboxes, that Saunders had padlocks for the toolboxes, that Saunders used nail polish to color-code the padlocks on the toolboxes, and that the toolboxes were driven to Pidge's driveway and then to a stash house. That is what happened on November 8, 2004: multiple toolboxes containing marijuana were recovered from the pick-up truck driven by Manning to Pidge's house.[3]

Adams will testify that some of the marijuana was often re-packaged into trash bags, that Sandra and Romprey showed up at the warehouse on multiple occasions in a van, and that the marijuana in the trash bags was placed inside their van. That is what happened on November 8, 2004: multiple trash bags of marijuana containing marijuana were recovered from the van driven away from the warehouse by Sandra and Romprey.

## Argument

Rule 404(b) of the Federal Rules of Evidence provides that evidence of prior bad acts is inadmissible to show bad character and consequent propensity to commit crimes, but may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

---

[3]The agents recovered color-coded padlocks and bottles of nail polish from the kitchen area of Pidge's residence, where Saunders and Pidge were located.

mistake or accident."

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

To admit evidence of prior bad acts, a trial court must find that the evidence passes two tests.  First, the evidence must have "special relevance" to an issue in the case, such as knowledge or intent, and must not include "bad character or propensity as a necessary link in the inferential chain."  United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996).  Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).

As the text of Rule 404(b) indicates, prior bad act evidence may be specially relevant if, for example, it goes to the defendant's knowledge or intent.  Where at least one permissible inference can be drawn from the evidence in question, it survives the ban on "bad character" evidence enunciated in Rule 404(b). United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990). The courts have consistently cautioned against the invocation of Rule 403 to exclude otherwise relevant evidence, calling it "an

extraordinary remedy to be used sparingly." United States v. Grassi, 783 F.2d 1572, 1579 (11th Cir. 1986). Quoting from the Fifth Circuit's decision in United States v. McRae, 593 F.2d 700 (5th Cir. 1979), the court in Grassi stated:

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing... [Rule 403] is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

783 F.2d at 1579. "[A]ll evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." United States v. Rodriquez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). Usually, courts use the term "unfair prejudice" for evidence that invites the jury to render a verdict on an improper emotional basis. For example, the First Circuit has upheld the exclusion of prior bad act evidence in part because it was "undeniably explosive," United States v. Gilbert, 229 F.3d 15, 26 (1st Cir. 2000), and been cautious when the prior act is a "shocking or heinous crime likely to inflame the jury." United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982).

In this case, Adams's testimony, in its entirety, is relevant to explain to the jury the background and origin of the drug conspiracy and the full nature of the relationship among the participants in the conspiracy.

7

> It is proper to include evidence of prior bad acts in conspiracy cases if they "explain the background, formation, and development of the illegal relationship and, more specifically, to help the jury understand the basis for the co-conspirators' relationship of mutual trust."

United States v. Santana, 342 F.3d 60, 67 (1st Cir. 2003)(*quoting* United States v. Escobar-de Jesus, 187 F.3d 148, 169 (1st Cir. 1999));[4] Varoudakis, 233 F.3d at 118 (same).

> In a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators. Evidence of a criminal association among the alleged conspirators can be probative in several respects. It can demonstrate the background of a relationship, a collaboration among several parties, or a mutual trust between conspirators. It can also rebut a defendant's claim that his association with the alleged conspirators was innocent.

United States v. Tse, 375 F.3d 148, 155 (1st Cir. 2004)(citations omitted). *See also* United States v. Scott, 270 F.3d 30, 46-47 (1st Cir. 2001)(evidence of defendant's other crimes or possible other crimes was admissible under Rule 404(b) to show development of co-conspirators' relationship); United States v. Edwards, 159

---

[4] In Santana, a case involving a charged cocaine conspiracy from 1997 to May 2001, the Court affirmed the district court's decision to admit the testimony of a cooperating witness concerning his regular purchases of cocaine from the defendant from 1992 to 1996, together with a limiting instruction "informing the jury that it could only consider [the cooperating witness's] testimony in deciding how the charged conspiracy or a trust relationship was formed, how the conspiracy operated, the identity of Santana, and [the cooperating witness's] credibility." 342 F.3d at 66-67.

F.3d 1117, 1129 (8th Cir. 1998)(Rule 404(b) allows admission of evidence that "completes the story of a crime or explains the relationship of the parties or the circumstances surrounding a particular event").

Here, the testimony of Adams concerning the many events that preceded November 8, 2004 is necessary to establish how the conspiracy was formed, how the conspiracy typically operated, and how all of the conspirators came together to make the conspiracy work. It is especially important to establish that the actions of Saunders, Sandra, and McIver on November 8, 2004 were performed with the requisite knowledge and intent to further the conspiracy's objectives or, to put it another way, to overcome the defense that they were "merely present" at certain locations (i.e., the Billerica warehouse and Pidge's residence) without guilty knowledge or intent. *See* United States v. Landrau-Lopez, 444 F.3d 19, 23-24 (1st Cir. 2006);[5] United States v. Rodriquez, 215 F.3d 110, 119 (1st Cir. 2000)(defendant's involvement in prior, similar drug crimes was admissible to show that he was knowing and intentional participant in charged crime and to

---

[5] In Landrau-Lopez, a case involving a cocaine smuggling conspiracy, the Court upheld the district court's decision to admit the testimony of a cooperating co-defendant that, on earlier occasions, the defendant had placed a cocaine-laden suitcase on an airplane and had stored cocaine for the co-defendant; the Court ruled that this evidence was admissible as probative of the defendant's knowledge and intent in placing two duffel bags on an airplane. 444 F.3d at 23-24.

refute his "mere presence" defense); <u>United States v. Spinosa</u>, 982 F.2d 620, 628 (1st Cir. 1992)(holding that evidence of prior drug sales was "sufficiently similar to the crimes charged ... to be probative of the fact that [the defendant] was not merely an innocent driver who was involved in the [drug] transaction by accident").  For example, the fact that Saunders was present inside Pidge's residence when the marijuana-laden pick-up truck driven by Manning showed up there can be viewed differently by a jury once they learn the history of the conspiracy and the full extent of Saunders's participation in it.  Similarly, the fact that McIvar helpfully brought a forklift to the warehouse on November 8 can be viewed differently by a jury once they understand the full extent of McIvar's participation in the conspiracy.  The government submits that it is entitled to give the jury the full picture of the origin and operation of the conspiracy and the nature of the conspirators' relationships among each other.

    The full testimony of Adams is also relevant to support his credibility.  The defense is going to attack Adams's credibility and to argue to the jury that his testimony is insufficiently reliable to find the defendants guilty.  The government is entitled to present evidence that corroborates Adams.  For example, the fact that law enforcement found water-logged containers in one part of the warehouse on November 8, 2004

corroborates Adams's account of what transpired there in connection with an earlier load.  The fact that Manning drove a pick-up containing marijuana inside toolboxes while Sandra and Romprey drove a van containing marijuana inside trash bags corroborates Adams's account of how the conspiracy typically operated.  The government submits that such corroboration falls within the non-exhaustive list of proper purposes for the admission of such evidence under Rule 404(b).  *See* United States v. Hahn, 17 F.3d 502, 508-09 (1st Cir. 1994)(prior traffic stop of defendant in which he was found to be in lawful possession of gun admitted because possession of gun, its serial number, ownership, and registration of vehicle, and other circumstances, corroborated testimony of witnesses in drug and firearm prosecution); United States v. Fabian, 312 F.3d 550, 557 (2nd Cir. 2002)(prior state-court conviction records of defendant and cooperating witness were admissible to establish that defendant and witness had long-standing relationship, thereby enhancing witness's credibility as a source of information about defendant).

Finally, the government submits that such evidence is not unfairly prejudicial to the defendants.  Since all of the evidence that the government intends to introduce against the defendants is prejudicial, it is only evidence causing "unfair prejudice" that should be excluded under Rule 403.  The term

11

"speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" or promotes "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Old Chief v. United States, 519 U.S. 172, 180 (1997)(*quoting* Advisory Committee's Notes on Rule 403).  The government is not attempting to admit evidence of some other conspiracy involving different persons or different drugs.  Rather, the government is attempting merely to show the jury the course of conduct, and the existing relationships, among the charged defendants prior to November 8 in order to put into context the events of November 8.  Armed with a limiting instruction from this Court, there is no real or substantial danger of unfair prejudice to the defendants.  *See* Weinstein's Federal Evidence at § 403.02(2)(c) (2nd ed. 2006)("If there is doubt about the existence of unfair prejudice, ... it is generally better practice to admit the evidence, taking necessary precautions by way of contemporaneous instructions to the jury followed by additional admonitions in the charge").

**Conclusion**

For the reasons set forth above, the government respectfully requests that the Court admit the testimony of government witness Richard Adams as summarized above.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/Michael J. Pelgro
Michael J. Pelgro
Assistant U.S. Attorney

DATED: July 3, 2006.

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that a paper copy will be sent to those indicated as non-registered participants as of July 3, 2006.

/s/ Michael J. Pelgro
Michael J. Pelgro
Assistant United States Attorney