UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | )Case No. 04-10363-DPW |
| 5.  ANTHONY SAUNDERS a.k.a    ANTHONY | ) |
| LUCENTE, a.k.a. "Big T", and | ) |
| 7.  SANDRA SAUNDERS, a.k.a. SANDRA | ) |
| LUCENTE a.k.a. SANDRA ROMPREY | ) |
| Defendants | ) |

<u>GOVERNMENT'S PROFFER OF CO-CONSPIRATOR STATEMENTS</u>

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully proffers the statements that the government anticipates it will seek to admit pursuant to Federal Rule of Evidence 801(d)(2)(E) in its case-in-chief.

(A)  Statements by Parra/Arellano to Undercover Agents

Attached as Exhibit A

(B)  Statements by William Stanley, Kevin McIver and Richard Adams in the Presence of Undercover Agents

Attached as Exhibit B

(C)  Statements to or by CW1 that will be offered through the testimony of CW1

Attached as Exhibit C

(D)  Statements to or by CW2 that will be offered through the testimony of CW2

Attached as Exhibit D.

The government submits that the statements by Parra, Arellano, Stanley, McIver, Manning, Adams, Sandra Saunders,

Anthony Saunders,[1] and Pidge, as taped by undercover agents or as relayed by two cooperating witnesses, are properly admitted into evidence pursuant to Federal Rule of Evidence 801(d)(2)(E), as statements of co-conspirators of the defendants during the course of and in furtherance of the conspiracy.

In order to qualify as admissions of a co-conspirator, statements must be made by a co-conspirator during the course of a conspiracy and in furtherance of the conspiracy. The government must show that a conspiracy that embraced the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy. United States v. Piper, 298 F.3d 47, 51-52 (1st Cir. 2002). The conspiracy must be proven through some evidence other than the statements themselves. United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993). The attached statements meet this standard.

A.    A Conspiracy Existed.

The testimony of these undercover agents, together with

_____

[1]The statements by Anthony Saunders and Sandra Saunders also fall within the exception for admissions of a party, under FRE 801(d)(2)(A). Additionally, some statements made in the presence of defendant Anthony Saunders, and not denied by him, are arguably also admissible pursuant to Federal Rule of Evidence 801(d)(2)(B). The government does not waive the right to argue these alternative grounds for admission by including the statements in its Petroziello submission.

surveillance agents and law enforcement agents, provide corroborating evidence that a conspiracy existed among the trial defendants with each of the co-defendant declarants. The undercover agents met with Parra and Arellano in Texas. At that time, Parra and Arellano told the agents that they were shipping 1500 pounds of marijuana to an experienced customer in Boston. Parra described the operations in Boston, and Parra stated that the drivers would see him in Boston at the hotel, whose name sounds was like Target. Parra instructed the agents that an Anglo would get in the tractor-trailer with them, but only after they had seen Parra. The agents then saw Parra in the back seat of Anthony Saunders' car, outside of the Tage Inn hotel. Surveillance agents observed Saunders drive Parra by the site of the trailer as well. Parra gave the drivers' a thumbs up sign as he rode past, and William Stanley got into the cab and directed them to the site of the offload. The undercover agents interacted at the site with Manning, Stanley, McIver, and Adams, in a manner indicating that each of those persons knew about and was participating in the marijuana smuggling.

Law enforcement agents observed the activities of and evidence related to Sandra Saunders, Anthony Saunders, and Frederick Pidge. Agents observed Sandra Saunders drive up to the warehouse and look out as bags of marijuana were loaded into her

van.  Agents observed Pidge's truck being driven to the
warehouse, loaded with marijuana, and driven to Pidge's house,
where Anthony Saunders and Frederick Pidge were waiting with
color coded locks and keys.  These facts each provide independent
evidence -- separate from the co-conspirator admissions at issue
-- that a conspiracy existed of which both defendant Anthony
Saunders and defendant Sandra Saunders was a member.

B.   The Statements were in Furtherance of the Conspiracy.

Each of the statements at issue was in furtherance of the
conspiracy under the law established by the United States Court
of Appeals for the First Circuit.  A statement is admissible
under 801(d)(2)(E) so long as it "tends to advance the objects of
the conspiracy as opposed to thwarting its purpose." United
States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995).  This
standard is administered flexibly. United States v. Garcia-
Torres, 280 F.3d 1, 5 (1st Cir. 2002).  The statement "need not
be necessary or even important to the conspiracy, or even made to
a co-conspirator, as long as it can be said to advance the goals
of the conspiracy in some way." United States v. Martinez-
Medina, 279 F.3d 105, 177 (1st Cir. 2002).

Here, the statements set forth meet the standard.

First, the statements to the undercovers advance the goals
of the conspiracy from the point of view of Parra and Arellano,

because they inform supposed new members of the conspiracy how the other members (the Anglos in Boston) of the conspiracy worked and how the conspirators were able to avoid detection.  Such statements advance the goals of the conspiracy.  Likewise, the statements of Stanley, Adams and McIver during the offload introducing themselves to new members of the conspiracy and chatting sufficient to get to know them, assists them in establishing trust with new persons who know their illegal business.  Therefore, these statements tend to advance the purpose of the conspiracy rather than thwarting it.  Flores-Rivera, 56 F.3d at 330.  The fact that the persons whom they were reporting to were in fact law enforcement agents rather than actual co-conspirators does not affect the analysis.  United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002) (statements are admissible "regardless of whether the third party is a tipster, and informant, an undercover officer, or a mere acquaintance.") See also Flores-Rivera, 56 F.3d at 330 (statements made to confidential informant).

The statements made to CW1 and CW2 also fall within the co-conspirator exception.  The statements to CW1 or CW2 identified the members of the conspiracy, their roles, and reported significant events involved in the conspiracy.  Such statements have repeatedly been held to be in furtherance of the conspiracy.

United States v. Collazo-Aponte, 216 F.3d 163, 183-84 (1st Cir.
2000), vacated on Apprendi grounds, 532 U.S. 1036 (2001)
(information about what had transpired and the people whom the
they were running a risk with was in furtherance of the
conspiracy); Flores-Rivera, 56 F.3d at 330 ("a person would need
to know the identities of the players in the organization, and
statements to this end are in furtherance of the conspiracy");
United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993)
("We think it is common ground -- and common sense -- that the
reporting of significant events by one conspirator to another
advances the conspiracy."); United States v. Masse, 816 F.2d 805,
811 (1st Cir. 1987) (identification of an individual as "the
source" tended to further the goals of a drug distribution
conspiracy).

Defendants can be expected to argue that the statements to
CW2 by Pidge after the marijuana was seized were no longer in
furtherance of the conspiracy because the conspiracy had ended.
However, that is not the law of this Circuit.  Under First
Circuit law, "[w]here a conspiracy contemplates a continuity of
purpose and a continued performance of acts, it is presumed to
exist until there has been an affirmative showing that it has
terminated." Collazo-Aponte, 216 F.3d at 187.  There is no "per
se" rule that the arrest of a conspirator terminates a

conspiracy.  Instead, while an arrest may thwart or lead to the abandonment of the conspirators' plan, a conspiracy continues so long as it can be carried out in absence of the apprehended party.  United States v. Sarno, 456 F.2d 875, 878 (1st Cir. 1972); United States v. Bello-Perez, 977 F.2d 664, 669 (1st Cir. 1992).  Here, at the time of the statements between Pidge and CW2, only Manning and Stanley had been arrested and charged. Each of the other persons was able to continue with the conspiracy unhindered.  Indeed, given the prior statements about the additional warehouse, even the fact that the McIver warehouse had been discovered did not indicate that the conspiracy had ended -- only that the offload location would likely need to change.  Pidge's statements to CW2 regarding the roles of the various participants therefore are fairly described as co-conspirator admissions.  They informed CW2 of significant events as well as of the historical roles of other co-conspirators. Therefore, these statements should be admissible as admissions of a co-conspirator pursuant to Rule 801(d)(2)(E).

For the reasons stated above, the government respectfully submits that the statements set forth in Exhibits A through D are properly admitted as admissions of a co-conspirator in furtherance of a conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E).

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    ____/s/ Nancy Rue_____
Nancy Rue
Assistant U.S. Attorney


CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF).

/s/ Nancy Rue_____
Nancy Rue
Assistant United States Attorney

Date:    July 28, 2006

Exhibit A


PARRA:      Oh, look.  There's one thing.  The guys from
            up there also . . .  The Anglos, they're very
            cautious.  You know how it is.
UC:         Yeah.  No.  Of course.  Yeah.
PARRA:      (UI).  Well, (UI) be among friends.  I'm
            going to unload at the warehouse over there,
            and, and the driver takes the trailer over
            there, but now it seems that they built their
            own, the assholes, because they used to pay
            for a place to unload.
UC:         Right.
PARRA:      (UI) one of their own, and they too, well,
            are now cautious over there.
UC:         Yeah.  Yeah.
PARRA:      When I arrive they ask me, "What's up?"
            Because I go.
UC:         Right.  Right.
PARRA:      For example, when you all get over there . .
            .  For example, you all are going to get over
            there (UI) . . . .
ARELLANO:   He goes with you all      . . .
PARRA:      And (UI) . . . .
ARELLANO:   . . . but he goes alone.  You know what I
            mean?  (UI) alone.
PARRA:      I go alone, not with you all.  It's separate.
            And that, hey . . . .
UC:         Yeah.
PARRA:      You're going to see me over there.  (UI).
            "Oh," you're going to see me.  You're going
            to feel comfortable then.  (UI), "It's that
            Anglo."  He then climbs on here alongside you
            all.
UC:         All right.
PARRA:      You know what I mean?
UC:         (UI).
PARRA:      And then you're going to go to the warehouse,
            so that there won't be any mistakes that . .
            . because Boston . . .  Have you ever gone to
            Boston?
UC:         Yeah.  Yeah.

PARRA:      That damn state.    It's that there are
            (UI) . . .
UC:         Yeah.
PARRA:      . . . the tunnels    (UI) . . .
UC:         Yeah.  Yeah.
PARRA:      . . . (UI) old.  He then goes with you.

```
                    You're then going straight to where you're
                    going to go park.
                              * * *
PARRA:              And another thing that I'm telling you, and
                    this . . .  That thing doesn't smell,
                    compadre.  It's professional work.  This man
                    knows.  He's already seen it (UI).
UC:                 Yeah, he, he . . .
PARRA:              The packages are not done in a dumb way.  We
                    spend on that shit.
UC:                 Yeah.  Well, you have to.
PARRA:              It's not done in a dumb way.  It's not.
                    We've passed a shitload through there.
UC:                 You have to.
PARRA:              It's very . . .  There are people who load
                    the packages in a dumb way.
UC:                 Yeah, you have . . . .
PARRA:              No, this is prepared well.
UC:                 You have to do it.
PARRA:              If you want (UI) with your own eyes when
                    they're unloading, if there's an opportunity
                    for you to go to the place that these Anglos
                    have, fucking good.  There's no problem, so
                    that you can see.
UC:                 Yeah.
PARRA:              And we never load a lot.  We always load
                    between 1,000 and 1,500, or 1,200.  We never
                    load more.  If you want to see with your own
                    eyes (UI) as well, so that my word (UI).
                              * * *
PARRA:              We, we were working some guys from
                    California.  Th . . . this guy also met them.
                    (UI) we give him . . .  We give the guy
                    $50,000.00 for each trip, for each job.  We
                    never load 2,000 or 3,000.  That I . . . for
                    the . . .  We always load between 1,000 and
                    1,500.  Sometimes we load . . .  Sometimes we
                    load just 700 because there isn't more, and
                    we still give him the same thing.
UC:                 Okay.
PARRA:              You know what I mean?
UC:                 Yeah.
PARRA:              That's the truth of the matter.  If you want
                    you can . . . when they unload over there,
                    you can see with your own eyes that it's no
                    lie.  Right?
UC:                 Mhm.
PARRA:              (UI) we handle four boxes.  They go by  four.
                    Sometimes we handle . . .  Sometimes we load
                    only two damn boxes.  Sometimes we might load
```

```
                    six.  We never load eight.
UC:                 And right now you all are going just . . .
PARRA:              (UI)?
UC:                 . . . just to, just to [Boston]?
PARRA:              No, to California also.
UC:                 To California.
PARRA:              Yeah.
UC:                 Okay.
PARRA:              Cali. . .California, Boston.  We used to go
                    to [Miami,] but not to [Miami] anymore.
                    It's, it's Calif . . .  It's, it's Boston,
                    Detroit, and California . . .  Los Angeles.
UC:                 (UI).
PARRA:              (UI).
UC:                 (UI).  Yeah, yeah.  No. (UI).
PARRA:              (UI) that area.  It's there, Detroit, and
                    that shit.
UC:                 Okay.
PARRA:              Except that we don't go exactly to Detroit.
                    We go to . . . a little further up from
                    Detroit, up on 127 . . .
UC:                 Okay.
PARRA:              . . . over there where it meets up with 75.
UC:                 Yeah, the other trip is probably going to . .
                    .
PARRA:              The, the, the . . .  Yeah.
UC:                 . . . going to Boston also.
PARRA:              No, not to Boston.  It's always one over here
                    and another one over there.  It was Boston .
                    . .
UC:                 Okay.
PARRA:              . . . then next it's Detroit.  Then next it's
                    (UI) . . .  Like that.  We're sending to
                    different places.
UC:                 Okay.
PARRA:              (UI).
UC:                 [So] then when I talk  to you (UI) you're
                    more or less going to know  wh . . . .
PARRA:              Yeah, one over there and another one (UI).
UC:                 I mean . . . .
PARRA:              We prepare the paper and all that stuff.
UC:                 Okay.  Well, just so   . . . .
PARRA:              No, the work is well done.  You're going,
                    you're going to find  out . . .
UC:                 Yeah.
PARRA:              . . . how it is.
UC:                 No, just so I know, you know, for the family
                    here.
```

\* \* \*

PARRA:      We have to discuss everything . . .
UC:         No, no.
PARRA:      . . . so that there's no problem.
UC:         No, no, that . . . .
PARRA:      If the Anglos up    there . . .  For example,
            those Anglos want . . .  There are some that
            there's no problem with you going to the
            warehouse.  The one from Detroit, that Anglo
            also takes it  from you.
UC:         Yeah.
PARRA:      He takes the truck.  I've got another friend
            there who goes and climbs on with you.  (UI)
            so that you can then be more (UI) you're
            going to see me also.  "What's up?"
UC:         Yeah.  Okay.
PARRA:      Then he goes and climbs on with you, and he's
            very trusting.  They're going to take you
            over there, and the Anglos up there also
            watch out for themselves.
UC:         No.  Well, of course.
PARRA:      (UI), "How are you all doing?"  "No, we're
            doing all right, son  of a bitch.  That's
            why we're here, if  not . . ."  They don't
            even let you leave Texas when there's a
            problem.  You know.
UC:         Okay.
PARRA:      So (UI).  He knows that, well . . .  Right?
            He goes there.  The one from, from Detroit
            too.  He picks it up, the son of a bitch,
            (UI).  And he takes it.  He brings it
            himself, the Anglo, the client.  He drives it
            himself.  He doesn't even bring his workers,
            the son of a bitch.   And the ones from over
            in Boston, we didn't used to have the
            warehouse before, but now since they
            supposedly built one, I don't know if he'll
            take me over there now.
UC:         Mhm.
                        * * *
PARRA:      And we work for periods of time.  Don't think
            that we work one trip, two.  No, we work for
            periods of time, years.  For . . .  I mean,
            for almost the entire year.
UC:         Yeah.  No, well, it has to be, so that . . .
PARRA:      Yeah.
UC:         . . . so that it can   be worthwhile.
            Well . . . .
PARRA:      I'm sometimes up there at Christmas.  I was
            up there last year at Christmas.  I spent it
            up there in Boston.  On the 24th (UI) in

```
                Boston.  (UI) the son of a bitch on the
                highway.
UC:             (LAUGHS)  No, but, well . . . .
ARELLANO:       The first of the year also.  (LAUGHS)
PARRA:          Also.  I . . .  Here in the truck, too bad.
                And the family, well, too bad, fuck that.
                              * * *
UC:             Uh, uh, [so] where, where do you want to go?
PARRA:          It's to Boston, to Boston.
UC:             But what part of Boston?
PARRA:          To Boston, Boston, there, Boston.  Well, do you
                have a map of the United States?
UC:             No, not with me.  (UI) truck.
PARRA:          (UI).
UC:             But, well, before we leave . . .
PARRA:          To see the map.
UC:             . . . we'll mark it.  We'll mark it, yeah.
PARRA:          I want (UI), for example, through where do you
                all go?  I want to show you a very good route
                through where my other people used to go.
UC:             (UI).
PARRA:          A very good route (UI).
UC:             Well, yeah, I remember that you said that you had
                a, a . . . .
PARRA:          A very good route . . .
UC:             Yeah.
PARRA:          . . . that doesn't pass through, that doesn't
                pass through Arkansas or through, or through
                Tennessee, which is very tough.  You know, right?
UC:             Yeah.
PARRA:          You take 35 up, (UI)    . . .  I know it by
                heart.  You take 35 up, and you go as if you're
                heading to Dallas.  Instead of heading to [Fort
                Worth,] you don't head to [Fort Worth].  You head
                for Dallas.  It's on 30 [west,] right?
UC:             Yeah.
PARRA:          When you get to Dallas don't head, don't head
                through, through the   . . .  It's 40 that's
                there.  Which one is it?  Which one is it?  You
                don't, don't head for

                Arkansas.  You don't head over there but you go .
                . .
UC:             Yeah.
PARRA:          . . . through 79 or 69.  Which one is it?
UC:             Yeah.
PARRA:          You go and end up . . .  You hit 44 up there,
                before you get to Tulsa, before you get to
                Oklahoma.
UC:             Yeah, yeah.
```

```
PARRA:      You only pay one toll booth on 44.  Do you
            remember?
UC:         Yeah, yeah.
PARRA:      It's very good through there.  All of that (UI)
            with the guys.  I've never had problems.
UC:         Yeah.
PARRA:      And we go through there, 44, 44, St. Louis,
            Missouri.  At St. Louis, Missouri you take 70
            [east].
UC:         [East,] okay.
PARRA:      And you take all of 70 [east] (MAKES A SOUND)
            until you hit 81 at Pennsylvania, at (UI).
            Remember that area?  (UI).
UC:         (UI).
PARRA:      Right below (UI) . . .
UC:         Yeah.
PARRA:      . . . a town that's called . . .  It's that I
            don't speak English. (UI).  It's written (UI).
UC:         (UI).
PARRA:      (UI) English.
UC:         Yeah.
PARRA:      (UI).
UC:         Yeah, yeah, (UI).
PARRA:      That 70, 70, 76 (UI).
UC:         Yeah.  Yeah.  Yeah.
PARRA:      (UI).  You hit 81 there, and there you take all
            of 81, compadre, all 81.  81 (MAKES ENGINE
            SOUNDS) until you hit 84.
UC:         Okay.
PARRA:      You go through [Scranton] . . .
UC:         Okay.
PARRA:      . . . so that you don't go in to New York, so
            that you don't go in to the city of New York.
UC:         Right.  Okay.
PARRA:      Do you get it?
UC:         Yeah.


PARRA:      You go through [Scranton,] and it's very good
            through there.  There are hardly (UI), and (UI)
            are always closed over there . . .
UC:         (UI).
PARRA:      . . . and more so when it's cold, they close them
            more.
UC:         Okay.
PARRA:      You go in through [Scranton].  At [Scranton] you
            take 84 (UI), 8 4 [Scranton]    . . .
UC:         Yeah.  Yeah, yeah, yeah, yeah.  (UI).
PARRA:      . . . that you're going to pass . . .  You pass
            through [Hartford].
```

```
UC:      Through [Hartford,] yeah.
PARRA:   And it's [Connecticut].  You pass through
         [Hartford].
UC:      Yeah.
PARRA:   Through (UI), all of those damn real pretty old
         areas.
UC:      (UI).
PARRA:   84, 84 until you hit 90.
UC:      Okay.

PARRA:   Do you know where 90 is?
UC:      Yeah, yeah.
PARRA:   You hit 90.  On 90 you go to, to Boston.
UC:      Anyway . . . .
PARRA:   There's just one toll booth on 90.  Take 90 when
         you leave 84, and there's a small toll booth.
         It's cheap.  Then you enter . . .  Then on 90, 90
         then, then goes into a town called Natick.
         Remember Natick?  (UI).
UC:      Yeah, yeah, yeah.
PARRA:   It's called Nari (PH), who knows what the fuck.
UC:      Yeah, I, I (UI).
PARRA:   And you go on 90 until you get to the tunnels.
         The buildings are in the center of the city of
         Boston, and there you take 93 north, 9 3 north at
         Boston.
UC:      At Boston.  Yeah.
PARRA:   From where . . . from 90 you're going to pass the
         tunnels and shit . . .
UC:      Okay.
PARRA:   . . . 93.  And I don't remember what exit it is,
         if it's exit        no . . . if it's exit 26.  I
         don't remember.  There's a hotel there
         named like, like the [Target] store.
UC:      Okay.
PARRA:   Or it's written Tarjet, Tar . . .  I don't
         remember.
UC:      Yeah.
PARRA:   (UI) . . .  But for a better point of re . . .
         but I don't remember which exit it is.  When you
         leave 90, right downtown, there where (UI)
         buildings, at the tunnels, there you're going to
         take nin . . . 93 north.
UC:      Okay.
PARRA:   And you go there and shit, and the point of
         reference that I use so that I don't get lost,
         there's a [Home Depot] on the right.  There's a
         [Home Depot].
UC:      Okay.
PARRA:   93 north . . .
```

```
UC:       Okay.
PARRA:    . . . a [Home Depot,] and it's the next exit, so
          there's no getting lost.  Eh, and there's a sign
          for the hotel in the back.  It's a hotel that's
          in front of a restaurant.  It's about a four,
          five story high hotel that's . . .
UC:       Okay.
PARRA:    . . . kind of yellow.  There's a restaurant
          there.  I don't remember what the name of the
          damn restaurant is.  You can park your truck
          there inside the parking, and a lot . . .  All of
          the truckers who arrive from California, from all
          over, park in front on the street.
UC:       (UI).
PARRA:    And there I meet . . .  We meet the Anglos there.
UC:       Okay.
PARRA:    And then I'll go there.  I'll go then.  (UI),
          "What's up?"  He's  going to see me then.  (UI),
          "This gu . . . this guy."  Then you, you go with
          them.
UC:       Okay.
PARRA:    The one who you see me with.  Don't just leave
          with any son of a bitch.
UC:       Okay.
PARRA:    As, as a precaution, to watch out for ourselves.
UC:       Yeah.  No, well, for damn sure.
PARRA:    It's there.  Can you find it?  93.
UC:       Uh, 93 north.
PARRA:    To not be calling, (UI) anything.
UC:       Yeah.  No.  No, no.
PARRA:    (UI) I don't have the damn map.
UC:       Eh, hey, but then what we can do tomorrow, I'll
          give you a map that I've got.
PARRA:    (UI) . . .  Okay.  We'll meet if you want.
UC:       And you take it.
PARRA:    No, no, I know it by heart.
UC:       No, no, but, I mean, so . . .  You mark it for
          me, and that way neither you nor I mess up.
PARRA:    No.  Remember.  Take 93 north when you get to the
          city of Boston.
```

<u>Exhibit B</u>

STANLEY:      Got bags here.  Gonna take you guys there allright can
              I fit in there  all right

UC2:          how you guys doin

STANLEY:      Ok um we gotta go up here and hit 93 north then we
              gotta go 128 south.  Ok

                              *  *  *

UC2:          got a long trailer and if I don't get off this I'm
              gonna lose it.

Stanley.      Yeah right there

UC2:          allright

Stanley:      to 93

UC2:          we're going  make a left here

Stanley:      yeah a left to 93

Stanley:      yeah

UC2:          switch over to the right

Stanley:      Yeah 93 north

STANLEY:      Right when I get there I'm gonna pay you guys the
              money know what I mean  get that out of the way

UC2:

Stanley:      how long did it take you, three days?

UC2:          yeah could have been here earlier probably yesterday
              but I came down with something.  I feel like crap

UC1:          how long to get there

Stanley:      Um probably like um not long maybe like an hour

Stanley:      what is it computers?  usually it's like real light
              stuff, like insulation.

UC1:          it's not heavy

[Stanley receives a phone call]

STANLEY:      yeah I'm headed towards n 93 now, allright.  I'll be
              up there.

Stanley:      like a long windy road and it's all landscaper
              business, pavers.  So it's all private ya know?

UC1:          you've dealt with Mike before?

Stanley:      yeah.

UC

Stanley:      still not right?

UC2:          that's why

Stanley           oh really, that's highway UI

UC2:          turn on 93 North here?

Stanley:      um yup, 93 north

UC1:          UI

Stanley:      oh really.  Gotta eat right?

              Get over one lane

UC:           over one?

STANLEY       yeah

STANLEY: [on telephone]
              hey John.  How far up on 93 North, I'm on 93 North
              right, until I get to 128 South?  John, John where
              are you?  I'm somewhere.  As soon as I see 18 South,
              take it?  Ok and then how far 128 South until I see
              Route 3 North again?  Ok.  So I'm just looking..i'm
              just looking for 128 South now right?  Alright alright
              alright  bye.

STANLEY:      you take crank to get out here?  You take crank to get
out here?

UC2:          no they fool with us.


phone rings

STANLEY:  Hello? Yeah, we're almost there.  Hey your phone…I

                tried calling you back…hey your phone…ah…you need
                minutes on that.  Huh?  Can't hear you.  Can you hear
                me?  Hello?

phone rings

STANLEY:   Hello?  I said I tried to call your number the 417 and
            I think   oh ok.  We're almost there, we're all right
            bye.

* * *

STANLEY:   UI..John

UCA UC2:   Ok.  Is he the one that owns this or the building or
lot?

STANLEY:   yeah  What's up, Kev?

[Machine sounds  in background]

UC2:       uhh

STANLEY:   John, whenever you can grab that forklift and we'll
start.

MANNING    I'm taking it off right now

STANLEY:   oh it's right there, all right
UC2   (laughs)

STANLEY:   UI  can you just put it there on the pallet?   Be
            careful there

UC2 laughs

Stanley  ui

UC2:

STANLEY:   Put it so we can like ya know out it right back on

UC2:       it's just too cold.

UC2:       too cold up here, boys.

UI in background

UC2:        is it supposed to get colder?

UI

UC2:        really?

UI:

UC2:        I'm  I'm I'm glad we're getting on the road tonight
            then

Kevin:      What's that???

UC2:        I'm glad we're getting on the road today then, headed
            back South.

Machine operating

Kevin:      It's five fuckin degrees…UI

UC2:        Wow, really?

            Real cold?

UC2:        wowo wow

Kevin:      Do you winterize your truck?

UC2:        yeah, we had it winterized..down in texas it's hard to
            find someone to winterize it

Background  I know

UC2:        cause we do most of our, most of our traveling down
            there but we were out get out of here

Forklift operating in background

STANLEY:    lock and load, baby

Forklift operating

STANLEY:    over here on the side please

On the side?

Forklift

STANLEY:    What's your first name, your names ???, right?

UC2:        yeah

STANLEY:    Can you get this strap? right out there near the
            dumpster right there

Background : What's wrong brother?

UC2: COLD

STANLEY:    Cold?  It's hot out here

UC2:        laughs

UC2:        hey, we live down there, it's almost 90 degrees.

Background conversation and forklift noise.

UC2 and UC  UI

UC2:  * * *   PAUSE.  Did you see what I did with my cough drops?
That's fine.

UC:  UI

UC2:        yeah but I can't find it.

UI

STANLEY:    rock and roll, baby.  We're almost there.

UC2:        It didn't take long at all.

STANLEY:    something you gotta do to start it.  He showed me last
            time.

ADAMS:      He showed me too.

            Nice talking to you

UC2:        Thank you

                          * * *
UC2:         soot that over, is that the last one?  Yeah

[Forklift sounds]

STANLEY:    …on the other side.

STANLEY:    something to MANNING

UC2:        we'll make room.

[Forklift sounds]

STANLEY:   UI

UI

UC2:       (laughs)

Phone ringing

STANLEY:   UI

STANLEY:   you got a paper to sign?

UC2:       Thanks, appreciate it. We'll do we'll do.  (off phone)
           no we're good.

STANLEY:   UI  drive slow.  see you next time. Take it slow Yeah.
           Allright.  Next time, I'll get you here quicker.

UC2:

Phone ringing

UC2:       thanks thanks

STANLEY:   we'll see ya around

UC1:       on phone in background in Spanish.

UC2:       hey fellas…hey guys

MANNING:   Yes?

UC2:       we forgot how to get out of here?

STANLEY:   oh yeah?

UC2:       we forgot to ask for directions  (laughs)  we got
           ready to pull out and we were like

STANLEY:   where you going?

UC2:       we just got back on 93 south or just head southbound

UI

UC2:       yeah I'm driving

MANNING:   it's very simple.  You're going to go over Route 3
           come to a Stop sign  tale a left.

UC2:       a left
MANNING:   yup, a left.  Not about ½ a mile up o the left you'll

```
              see route 3.  Route 3 South to 95 South

UC2:          very good

MANNING:      very simple

UC2:          appreciate it

MANNING:      not a problem

UC2:           yeah because he forgot 128 and 95 are the same

MANNING        yeah they are

UC2:          so we went up about 20 miles.  Nice day for a cruise
```

Exhibit C

CW1 borrowed money from Frederick Pidge ("Pidge") to buy a cellular telephone store.  Pidge told CW1 that he could make hundreds of thousands off the store.  Pidge told CW1 that he would lend him the money.

In December 2002, CW1 approached Pidge because he needed a way to earn more money.  Pidge told him that he had some work for him.  Pidge came to see CW1 at his job and told him "I've got a truck coming in tomorrow that you can unload."  Pidge then explained: "There's a load of reefer coming in.  You can make some money."

CW1 went to Pidge's house after work.  Pidge introduced the people in the room.  "That's Big T.  That's John." Pidge did most of the talking during the meeting.  Pidge explained that they would meet at his house in the morning, and wait for the call.  He said that the Mexicans would be there in the truck, and the truck would come up.  Pidge said: "Tony is the boss."  Pidge told Tony: "You call Ricky and John."  Pidge said that Tony would get a call from the Mexicans.  He said that the truck was close, because it was already in New York.  He told CW1 that he could make $5,000.

Exhibit C                                              page 1

A couple of days after the unload was finished for a load that was 3 boxes, 2 large boxes and a small one, CW1 met at Pidge's house. Pidge told him: "Tony's going to give you $2,000." Pidge said that it was $2,000 because it was a small load. Pidge told him "Tony says you get two grand for this."

With regard to other loads, CW1 said that Pidge would call and would say "I've got some work, I'll let you know when and where." The night before one of the loads, he called and said: "Be ready in the morning." The next morning, Pidge called and said: "Go to Billerica."

On another load, they were packing the marijuana in toolboxes and bags. Billy Stanley took a telephone call on his cellular phone and then yelled out: "Get the bags ready, they're on their way." CW1 did not know who it was, but they rushed to get contractor bags full of marijuana ready to go, filling them with four 3-kilogram bricks. Stanley said that they needed to have 15 bags ready. A man and a woman arrived at the warehouse driving a van. Billy Stanley said: "That's Tony's mother Sandra and her boyfriend." Sandra Saunders said: "We have to get to New Hampshire."

Pidge told CW1 that Sandra Saunders was Tony's mother.

Exhibit C                                    page 2

CW1 was at Pidge's house about four times per week. Tony Saunders was present about half of those times. After the second or third load, Tony Saunders said to Pidge: "get the money ready to be sent out tomorrow."

CW1 was receiving small amounts (five to twenty pounds) of marijuana from the loads and selling it. He was provided the marijuana in advance, with the expectation that he would pay it promptly upon selling it. Pidge told CW1 that Saunders set the limit to how much CW1 could be trusted with prior to payment. Pidge told him that Saunders had said initially that he had a five pound limit. Pidge later told CW1 that Saunders had increased the limit to ten pounds. Eventually, Pidge told CW1 that Saunders had told Pidge that CW1's limit was up to twenty pounds.

During the load on November 8, 2004, Stanley said that he had received a phone call from Saunders telling Stanley how many trash bags were to go with Sandra and her boyfriend.

After one of the loads, Pidge told CW1 that McIver received $25,000 for the use of his warehouse.

Pidge and Tony Saunders told CW1 that they paid $1,000 per pound for the marijuana.

Exhibit C                                    page 3

Pidge told CW1 that Saunders had sent Manning to Florida to pick up marijuana for him in the past. Pidge told CW1 that the Mexicans in Florida were angry because they could not find Manning. Manning was at a bar.

Exhibit C                                    page 4

<u>Exhibit D</u>

CW2 is expected to testify that in December of 2002 he arrived at his warehouse to find John Manning there with Anthony Saunders.  CW2 had previously known of Saunders because Manning had told CW2 that Manning had made trips to Florida to pick up marijuana for Saunders.  Manning had told CW2 that Saunders had asked Manning to drive to Florida. Manning had told CW2 that Saunders told Manning that when Manning got there, he would check into the hotel and leave the keys in the car in the parking lot.  Manning told CW that Saunders had told him that the Mexicans would come and pick up the car from the parking lot.  They would fill it with marijuana and then return it to the parking lot. Manning had told CW2 this in order to ask CW2 to rent a car for Manning to use on the drive to Florida.  CW2 did in fact rent the car for Manning in order that Manning could drive to Florida for a load of marijuana.

On the day in December 2002 when CW2 arrived at the warehouse to find Manning and Saunders present, Saunders said that he was interested in using CW's "yard," referring to the warehouse property, and Saunders asked CW2 if he could use the the yard saunders to bring in a truck and unload it there.  CW2 said that he would think about it.

About a week later, CW2 received a call from Frederick Pidge
stating that Saunders wanted to meet CW2 at McDonalds in
Lexington, on Rte 128.  CW2 agreed to meet them.  CW2
arrived and Pidge told CW2 that Saunders was inside.  Pidge
and CW2 went inside the restaurant to meet with Saunders.
After Pidge left for the men's room, Saunders told CW2 that
he had a truck coming in, and he needed someplace to unload
five boxes.  Saunders told CW2 that the boxes weighed
between 300 and 350 pounds and Saunders would need equipment
for unloading them.  Saunders asked CW2 about the use of a
"bobcat."  CW2 told Saunders that a forklift would be
better, and that CW2 had a forklift.  Saunders told CW2 he
would pay CW2 $5000.  Pidge returns to the booth and asked
CW2 if Saunders told him what he wanted.  CW2 says yes and
talks about the boxes, their weight and that he will be
getting $5000.  Pidge said that the price was ridiculous,
and that Saunders should pay CW2 $30,000.  Pidge asked if
Saunders had told CW2 what was in the boxes.  Saunders then
told CW2 that the five boxes would contain "weed."  Pidge
then told CW2 that this would be a good way to repay the
money that CW2 owed him.

CW2 asked Saunders "what's the risk?"  Saunders told
CW2 that the operation was "foolproof."  Saunders said that

the marijuana was packed in metal boxes.  Saunders said that
the truck had a car in front and one behind that follow it
all the way out of Texas.  Saunders told CW2 that the lead
car traveled 5-6 miles ahead looking for police.  Saunders
stated that he had been "doing this for years and there is
no risk."  Saunders told CW2 that the upcoming shipment the
first larger shipment that he had done.  He said that this
load would be 1500-1700 pounds.  Saunders told CW2 that the
marijuana was coming from Mexico through Texas and that one
of the Mexicans would be in the one of the cars.  Saunders
told CW2 that he does a load every few months, and that he
had a "good system down."  CW2 agreed to allow his yard to
be used for the offload.  Saunders told CW2 that Saunders
would pay him in cash, within a few days of the offload.
Saunders stated that CW2 would not have to be present.
Saunders said that Manning would be there to handle the
unloading.  CW2 told Saunders that he didn't want his yard
left a mess. CW2 told Saunders that "you can use it, but I
don't want any part of cleaning up your mess afterwards."
Saunders told CW2 that "we'll take everything with us" and
that "we'll leave it just like we found it."

    Within two or three days of the McDonald's meeting, CW2
received a telephone call from Pidge at about 7pm.  Pidge

told CW2: "we need your shop to do that side job tomorrow."
Pidge told CW2 that it would be early in the morning.  CW2
told Pidge that he and his crew would meet at the yard by
6:15am, so needed to do it after that.  Later the next day,
CW2 received a call from the yard, stating that they had
started to use the acetelyne torch to cut the boxes open,
but they were concerned about using the torch because the
smoke was too noticeable.  CW2 suggested using a "cut-
off"saw, and he told Manning to go buy one.

A few days after the unloading, CW2 asked Manning how
they had gotten the drugs out of the yard.  Manning reported
that he had used a pickup truck belonging to CW2 that was
parked in the yard.  CW2 told Manning not to ever use it
again to move the drugs.   CW2 observed the debris left by
the offloading; the metal boxes, cardboard wrapping and a
saran wrap type material and was upset about it.  He told
Saunders that he wanted "no part of your mess."  Saunders
told him "we'll take care of it."  CW2 called Manning and
asked "what are you going to do with all of this?"  Manning
said that he would take care of it.


CW2 received a call to meet Saunders before Christmas.
Saunders arrived with Pidge in Pidge's truck.  Saunders

approached CW2 and told him "here is the money I owe you." Saunders then told CW2:  "Don't say a f**kin' word" and showed CW2 a photograph of CW2 with CW2's child.  Saunders told CW2, "Don't ever say anything to anyone because if you do,  the Mexicans will cut you up and put you in those metal boxes and ship you back to Texas and no one will ever find you." Pidge came to the drivers window and said "I took the $13,000 off the top."

In January 2003, CW2 received a telephone call from Pidge.  Pidge stated: "we have side work to do."   Pidge also stated: "Tony wants to use the warehouse in a few days."  On the day of the load, CW2 knew that Manning was not available to assist, because Manning was on a cocaine bender.  After the offload had occurred, CW2 noted that the gate at the yard was bent, and he called to ask Pidge what had happened to it.  Pidge told CW2 that the truck had slid on the ice and slid into it.  Pidge told CW2 that "we'll be in touch in a few days."  Within a week, Pidge called CW2 on CW2's cellular telephone, and he stated "Tony has the money for you.  Where should I meet you?" Pidge asked if CW2 could come over that way, and CW2 asked what was close.  Pidge suggested a Burger King in Newton.  When CW2 arrived at the Burger King, Saunders was a passenger in Pidge's truck.

Saunders got out of the truck when CW2 arrived.  Saunders went to CW2's window and said, "Here is the $12,000."  CW2 said "we agreed on $30,000."  Saunders said that it was a small load, 2 and ½ boxes.  CW2 then complained to Saunders about the debris that was being left behind at the yard. Saunders said that John Manning would take care of it – " that is what he gets paid for, unload it and dispose of the remnants."

A few weeks after this meeting, CW2 complained to Pidge about receiving $12,000 when he had been promised $30,000. Pidge told CW2 that he would talk to Saunders.  However, Pidge said "Tony is in charge, he makes the decisions and decides who gets paid what."

In June or July of 2003, Pidge told CW2 that Saunders was putting up a metal pre-engineered building in Hopkinton. Pidge raised the possibility of CW2 doing the site work, but CW2 never followed through because he had enough work.

In approximately October of 2003, Pidge called CW2 and said "we have some side work to do."  CW2 asked Pidge: "How much longer is this going to go on?"  Pidge told CW2 that the building that Saunders was putting up in Hopkinton was for his own use, and so Saunders would not seeking to use CW2's building much longer.  CW2 then said "Ok, go ahead,

fine." Shortly after that, CW2 went back to his warehouse in the middle of the day to pick up a plate compactor that he had left behind. John Manning, Richards Adams and a Mexican were unloading insulation materials from a tractor-trailer when he arrived. At that time, CW2 had a conversation with the driver of the tractor-trailer. CW2 asked "how do you do it?" The driver responded that they load the trailer with lightweight materials so that it doesn't set off alarms. He said it must be "full but light, so not to cause suspicion." The driver also told CW2 that the load might sit on the border for a while before being brought across. The driver told CW2 that he had five trucks and he went all over the country doing the same thing. CW2 was introduced to Richard Adams, who said that he was a friend of Freddie's.

Shortly afterward, CW2 received a call from Pidge. Pidge said to come on by – Tony's here. When CW2 arrived at Pidge's house, Saunders was there. Saunders paid CW2 using four small Godiva chocolate bags containing US currency, mostly $20 bills. CW2 needed to get a paper bag from Pidge before he left the house to put the small bags into. Saunders thanked CW2 and patted him on the back before he left. After CW2 got home, he realized it was only $20,000.

CW2 called Pidge and complained that the deal had been $30,000 per load, but that there was only $20,000. Pidge said that he would talk to Tony. CW2 said he wanted the rest of the money. Later, when talking with Pidge, CW2 asked Pidge whether he had talked with Tony. Pidge said, "I talked with him. He said it was a bad load and he can't move it." Pidge also said "you know how it is with Tony, it goes in one ear and out the other."

The next load occurred in about December 2003 without any warning to CW2. CW2 was at his warehouse in the morning when Pidge and Saunders arrived. Saunders told CW2 that it was "a small load, just a couple of boxes." He told CW2 that the truck was just down the street, and that they needed to use the yard. Saunders said "I know I didn't give you what I was supposed to last time. How much do you want for this?" CW2 said $15,000. Saunders said "how about $12,000?" and CW2 agreed. A few days later CW2 asked Pidge why there was no notice on this load. Pidge said it was a remainder of a larger load that went to someone else — that someone else did not take their full load. CW2 said this load was in early December of 2003, but was warm for this time of year. CW2 said he got call two or three weeks later and went to Pidge's house on Christmas Eve. Pidge told him

that Saunders had been there earlier and left something for him.  Pidge gave CW2 a bag with $12,000 in it.  CW2 told Pidge, "This is bullshit, I'm taking too much risk."  CW2 told Pidge that Saunders just paid what he wanted to, and that he wasn't willing to do it any more.  Pidge told CW2 that Saunders was almost done with his place in Hopkinton.  CW2 asked who ended up doing the site work, and Pidge told him that they had used equipment from Tony's uncle.

CW2 stated that there was an additional load in February 2004.  Pidge called him in advance and told him that "they had some side work coming."  CW2 responded "Give me $25000 or I'm not doing it."  Pidge said: "I'll talk to Tony."  A few weeks later, Pidge called and asked CW2 to meet him.  Tony was present and gave him $25,000.  Later, Pidge told CW2 that it had been a bad load. Within a few weeks, one of the toolboxes that was used to transport the marijuana  was returned to the warehouse.  CW2 tried to move it, but it was full.  CW2 asked Pidge about it, and Pidge told him that the load was no good and they had a tough time selling it.  CW2 repeatedly asked Pidge about getting rid of the box, and Pidge said Tony was going to come and get it each time.  Finally, CW2 said that he finally told Pidge to get rid of it or he would dump it on Route 3.  One day, CW2

went to the warehouse and the box was gone.  Pidge told CW2
he and Saunders came and took it.  Pidge said that the load
was bad and that they had managed to sell all of it except
the one tool box.  He said that they had sold it at half
price just to get rid of it.

In March 2004, CW2 received a telephone call from Pidge
asking whether they could use the yard.  CW2 said ok.  A
couple of days later, CW2 received a telephone call from
Pidge at about 6:00 or 6:30 p.m. that Manning was "on a
bender" and that they were at the warehouse and could not
get the boxes open.  Pidge asked CW2 if he could go back to
the warehouse to do it.  CW2 agreed and went to the
warehouse, where he found Adams and Stanley attempting to
cut open the boxes.  CW2 assisted in opening the steel
containers, unloading them into toolboxes, and locking the
toolboxes.  He asked Stanley about the locks for the boxes.
Stanley told CW2 that they are paired in twos, a set of two
for each of the toolboxes.  Stanley told CW2 that Tony had
the keys to the locks. After the containers of marijuana
were opened, and the marijuana was loaded into the
toolboxes, the toolboxes did not all fit onto Pidge's truck.
CW2 took one of the boxes with him.  The next morning, Pidge
called CW2 and asked where he was.  CW2 said he was at home,

and Pidge said "we'll be by."  Saunders and Pidge came by to
pick up the box.

Pidge called a day or two later and told CW2 that the
count was off, and that they were missing a block of
marijuana.  He blamed Manning for it.  CW2 told him that
didn't make any sense, since Manning wasn't there.  Pidge
asked CW2 if he had seen anything, and he said no.  CW2 told
Pidge that Pidge could go back to the warehouse and look for
it.  Pidge told CW2 that he and Tony had gone back to look
for it, but they couldn't find it.

CW2 found the block of marijuana a few weeks later.  He
called  Pidge and told him he had found it, and Pidge came
and got it.  He told Manning about having found it, and
Manning asked him "Why didn't you just give it to me?"

On August 4, 2004, CW2 received a call from Pidge.
Pidge said he had "sidework."  Manning came over to CW2 at
the site where they were working and told CW2 that he had
gotten a call from Fred and Fred said they had some
sidework. A few days after the load CW2 got a call from
Pidge asking him to meet Saunders at the Pancake House in
Allston.  CW2 went there and waited about an hour.  CW2 then
called Pidge and told him that Saunders had not arrived.  A
short time later, William Stanley arrived and parked next to

him.  He handed him the brown paper bag containing $25,000 in $20 bills, and said "Tony says thanks."

About a week before the shipment seized November 8, 2004, CW2 received a series of voicemails from Pidge asking CW2 to call him.  CW2 did not return the calls.  A few days before the shipment, Manning told CW2 that they were expecting a shipment.  CW2 told Manning, "No one has called me."  On November 8, 2004, CW2 received a telephone call at home at about 6:30 a.m. from Pidge.  Pidge asked CW2 if he was on his way to the shop.  CW2 said that he was, and Pidge told CW2, "I'm here now.  We have a load coming in."  CW2 asked Pidge when, and Pidge said "in a couple of hours."  CW2 said "I'm getting sick of this," and they went back and forth about whether or not CW2 would allow the truck to be unloaded at the warehouse.  Pidge told CW2 "this is the last time, Tony's warehouse is all done."  Finally, Pidge walked away and then came back.  He said to CW2 "what do you want to do?"  CW2 said "Aw f**k it, just do it."

Pidge called CW2 on November 12, 2004.  Over the telephone he said to CW2, "Can you believe what Manning did? He borrowed my truck?" and then said "can you meet?"  They met in person, driving around in a car, whispering, with the car radio on.  Pidge asked CW2 what had happened at the

warehouse, and CW2 explained that he had been called back and that he was asked to sign a consent form, and that he did.  CW2 said that he had tried to be as cooperative as possible without telling anything.  CW2 asked Pidge what had happened at his house.  Pidge responded that agents had followed Manning from the warehouse and that agents arrested him as he was coming in the door.  Pidge said that Tony and he had been inside his house waiting, and that the agents had grabbed a money counting machine, a toolbox with a small bud of weed, and some color coded locks.  Pidge said that the agents had questioned Pidge and Tony and that they took Tony out to question him in a vehicle.  Pidge said that Saunders told him that he had had the keys to the locks on him and that he dropped them in the bushes on his way out to the car.  Pidge told CW2 that he was concerned that Saunders was in the car with the agents for so long.  Pidge said that he was concerned that Saunders was trying to pin it on him. Pidge thought Saunders would do that because of instances in which Saunders had mailed money back to California to pay for the marijuana.  When the packages were intercepted, someone else always got busted.  Pidge said that Tony was always just far enough away to get out of it.  CW2 asked Pidge who all was arrested.  Pidge told CW2 that Manning and

Stanley had been arrested at the warehouse and that Ricky
had been there but they did not get him.  Pidge said that
they had arrested Tony's mother and her boyfriend just down
the street from the shop, but that they had had to let her
go under Massachusetts law.  CW2 asked what Tony's mother
was doing there.  Pidge told CW2 that she was picking up
weed and she was caught with about 500 pounds.  Pidge told
CW2 that she had been at the warehouse other times -- that
she was the one who picked it up in trash bags.  CW2 asked
Pidge if Saunders was out of his mind and said you would
have to be to get your mother caught up in this.  Pidge told
CW2 that she had been busted previously driving a U-Haul
across the country for him.  Pidge said it was years ago,
and that she had done a year in jail over it.

Pidge called CW2 shortly before Christmas and asked if
they could meet.  Pidge reported that Sandra Saunders,
Romprey and Adams had been indicted.  CW2 asked what Tony
Saunders was going to do about his mother.  CW2 asked "why
doesn't he take the blame for her and get her off the hook?"
Pidge told CW2 that "He won't do it, he's all about
himself."